DUFRESNE, Judge.
This is an appeal by Yvonne and Leonard Laker, defendants-appellants, from a judgment forfeiting their $33,500.00 deposit on a condominium which they contracted to have built, but upon its completion, refused to purchase. The Lakers asserted at trial that Crosby Development Corporation, (CDC) plaintiff-appellee, did not construct the residence according to the original contract specifications, and did not deliver timely a merchantable title. The trial judge rejected both assertions and found instead that the unit was properly built and that there were no defects in the title tendered. He therefore awarded CDC the deposit as stipulated damages, as well as reasonable attorney fees (fixed at $7,500.00) both of which were provided for in the contract in the event of a breach. Because we find neither legal nor manifest factual error in the judgment of the trial court, we affirm that judgment.
The facts are these. DeLimon Place is a townhouse and condominium development which was begun by Crosby Development Corporation (CDC) in the early 1980⅛. By 1985, some 100 units of various styles had been built and sold. In mid-1985, the Lak-ers approached the developer about having a townhouse built, and on June 22, 1985, the parties reached an agreement for construction of a unit at 300 Rue St. Peter. The original contract price was $350,000.00, all in cash, with no prediction on the buyers’ ability to obtain financing, plus the costs of any extras which the Lakers might subsequently request. Completion of the project was to be on or before June 22, 1986, and the act of sale was to be passed before the Lakers’ notary. The contract further provided the standard 60 day extension of the closing date should curative title work be required. It was also agreed that in the event of a breach, the other party could demand either specific performance of the agreement, or payment of stipulated damages of $33,500.00, plus reasonable attorney fees. Finally, the Lakers were required to place with the developer a deposit of $33,500.00.
As to the actual unit to be built, the contract provided that construction was “to be completed similarly to the model unit at 303 Rue St. Ann.” At trial, John Crosby, Jr., president of CDC, explained that the entire DeLimon Place project had been planned so that each lot would have a particular pre-designed type of unit built upon it. The designation of the unit type for 300 Rue St. Peter was “R-l”, while that for 303 Rue St. Ann was “P”. Both types were, however, three-story units laid out in a similar floor plan, except that the “R-l” was 4,450 square feet, while the “P” was only 4,219 square feet. Crosby further explained that the reference in the contract to the model unit at 303 Rue St. Ann was only for purposes of the finish, quality and style of construction, which included such items as paneling, carpets, etc. Mrs. Laker similarly testified that she knew the contract was for an “R-l” model, with certain modifications that she had requested, and indeed an “R-l” plan, with those requested changes drawn in, was attached to the contract.
There was also general agreement that during the year of construction of the unit, and particularly in the latter months, Mrs. Laker was on the premises at least on a weekly basis. Typically she dealt with Lisa Crosby Forshag, a CDC employee who coordinated with the workers stylistic and design change request made by buyers. Ms. For-shag’s testimony, corroborated by copious notes as well as formal change orders signed by Mrs. Laker, established that the project went forward to Mrs. Laker’s general satisfaction up to the last four or five weeks of construction. During that latter time frame, disputes arose as to three aspects of the building, namely 1) the passage between the kitchen and dining room, 2) the color of the stain on the wood ceiling beams in the den, and 3) certain wallpaper in the master bedroom. The Lakers testified at trial that because of these alleged defects they decided not to buy the house, and on Wednesday, June 18, they so informed Harry Crosby, construction superintendent of CDC. Apparently, because the contract expiration date was Sunday, June 22, Crosby notified the Lakers that he would tender title before his own notary on Friday, June 20, at 4:00 P.M. *310 The Lakers showed up for this closing, but declined to go through with the sale, ostensibly on the grounds that there were title defects. Thirty-five days later, on July 29, the Lakers’ attorney, Robert G. Creely, wrote to John Crosby, Jr. a letter in which he demanded return of the $33,500.00 deposit and informed CDC unequivocally that the Lakers would not buy the property because they were not satisfied with the quality of the workmanship.
Suit was filed by CDC against the Lakers for damages for breach of the contract, and the Lakers reconvened alleging a breach on the part of CDC. After a bench trial, judgment was rendered in favor of CDC for the $33,500.00 deposit plus $7,500 in attorney fees. The Lakers now appeal, alleging here, as they did at trial, that the house was improperly constructed and that the title was defective.
As to the question of proper construction of the house, the trial judge found that it was properly built, and further noted that the developer had gone to great lengths to incorporate all post-contractual modifications requested by the Lakers. Those being factual determinations, the issue before this court is therefore whether these findings are manifestly erroneous, Rosell v. ESCO, 549 So.2d 840 (La.1989).
As briefly mentioned above, in the later stages of construction, the Lakers raised questions about the kitchen passage, the col- or of the beams and certain wallpaper. Mr. Laker testified at trial that there were also difficulties with warping in some of the floor underlayments, as well as various other punch-list type items. However, Harry Crosby stated that on June 18, when Mr. Laker informed him that the house was unacceptable, he only mentioned the passage, the beams and the wallpaper.
Of these three matters, Mrs. Laker admitted at trial that the wallpaper was not in fact upside down' as she had previously thought, and that she did not consider that a problem by June 20.
As to the stain on the ceiling beams in the den, there was conflicting testimony. Mrs. Laker stated that the beams were too dark and red for the other light oak panelling. She further said that when she complained in May about the color, she was sent a sample of wood with a different stain which Harry Crosby said could be applied to lighten the beams. She further stated that she found this stain too green and so notified Crosby, after which time he made no further effort to correct the problem. Lisa Forshag, the CDC representative, testified to the contrary that Mrs. Laker never got back in touch with her one way or the other about whether the lighter stain would be acceptable. She also produced a page of notes, identified as having been contemporaneously made, which showed that she had telephoned on June 12, 13, 16 and 17 to inquire about the light stain, and on each occasion was told by Mrs. Laker that she had not decided yet. Harry Crosby corroborated Ms. Forshag’s version of these events. Finally, John Crosby, Jr., in his letter of June 18, 1986, unambiguously reiterated his offer to re-do the beams to the Lakers’ satisfaction and at no additional costs.
Considering the above evidence, it is obvious that the trial judge credited the testimony of Ms. Forshag and the Crosbys to the effect that they were willing to correct whatever objections the Lakers may have had to the beams, but were never given an opportunity to do so prior to the refusal to complete the sale. In this circumstance, (and even assuming that the original color of the beams was not according to contract specifications), it can hardly be said that CDC breached the contract in not correcting this alleged problem because of the Lakers’ inaction.
As to the passageway between the kitchen and the dining room, there was again conflicting testimony about how this area should have been built. It was generally agreed that the standard “R-l” models have a door across this passage. A view of this door from the dining room side would show the right edge of the door frame to be about nine inches from the corner of the room. During the framing stage of construction, Mrs. Laker decided that she did not want the door, but rather an open passage. The carpenters took out the nine inch section of wall framing on the right side, thus making the side wall *311 an uninterrupted run from the dining room into the kitchen. No change was made on the left side. The result was simply to widen the passage by some nine inches.
- Mrs. Laker testified that she assumed the left side of the opening would also be shortened to widen this passage further, and that the wider passage was what appeared in the model unit at 303 St. Ann. She said that she had repeatedly asked a workman about the width, which seemed too tall and thin to her, but she was repeatedly assured that once the sheetrock was up, it would appear wider. She testified that it was only during the last month of construction that she realized that the passage was too narrow, and when she complained, she was informed by John Crosby, Jr. that nothing could be done.
John Crosby, Jr. testified that he knew that Mrs. Laker had requested that a door not be installed and that the nine inch right protrusion had been removed. He further said that the sheet-rock was installed some six months before completion of the unit in June of 1986, and that until the final month he knew nothing about any complaints concerning the opening. Lisa Forshag similarly testified that she had heard no complaints about the opening until a walk through in May 1986, when Mrs. Laker first asked her if the opening could be widened. She said that she told Mrs. Laker that she didn’t think anything could be done, but that she would ask John Crosby, Jr. She said further that she so informed Mrs. Laker and that nothing further had been said about it by Mrs. Laker until the week of the closing.
Again, it is apparent that the trial judge credited the testimony of CDC’s employees over that of Mrs. Laker, as to the design and construction of the passage. If that testimony is believed, then it is obvious that the door and nine inch protrusion were removed during framing and that the passage was sheet-rocked some six months prior to completion of the house. Because there is no dispute that Mrs. Laker was at the house repeatedly during the last months of construction, her testimony that she didn’t realize until the final few weeks of construction that the passage was too narrow is questionable at best. We thus find no manifest error in the trier of fact’s finding that the passage was constructed properly.
The next issue concerns the tender of title to the property. As recited above, the contract provided that the act of sale was to be passed before the buyer’s notary. Relying on that provision CDC sent a title description, survey, and related documents to Robert Creely, the Lakers’ notary. Creely began preparing for a sale which he intended to pass on June 23, 1986, the Monday after the contract’s Sunday expiration date of June 22. He testified that he had reviewed a title abstract and would have issued a policy of title insurance on the property had the sale gone forward on June 23. He further testified, however, that the mortgage certificate of June 20 which he reviewed showed a $7,000,000 mortgage on the entire DeLimon project.
He stated that had he been called upon to pass the sale a 4 P.M. on Friday, June 20, that inscription would have been a problem because even had the 300 St. Peter property been released (which in fact had been in January of 1986) it would have been difficult to verify that fact late on a Friday afternoon. It was further Creely’s opinion that aside from the in fact erroneous mortgage inscription, there was nothing wrong with title to the property that CDC tendered on June 20, 1986. He finally stated that he had been told around June 18, by Mr. Laker that he did not intend to go through with the sale, and Creely therefore did not attempt to actually set a closing on June 23.
Michael Dorsey, the notary who attempted the closing of June 20, also testified that he had examined the title and found no defects, and that he was prepared to issue title insurance with no reservations. He finally stated that he had in his possession at the June 20, closing a certified copy of the January 1986, release of the subject property from the $7,000,000 mortgage.
On the above testimony, £he trial judge found that there was no problem with the merchantability of the title presented. The Lakers argue to the contrary that the $7,000,000 mortgage was at least an apparent defect as of June 20, and therefore they were *312 not obligated to accept that title on that date. This argument ignores two pertinent facts. First, it was the Lakers who first announced their intention not to buy the house only three working days before expiration of the contract. The notary for CDC had, therefore, little time to prepare for a sale, much less correct any mistakes which might appear in mortgage certificates. Second, the contract provided an additional 60 days for any curative work on the title. Thus, even could it be said that the erroneous mortgage certificate constituted an apparent defect as of June 20, CDC had two more months in which to have a corrected certificate issued. However, on July 29, the Lakers, through their attorney, again informed CDC that they would not buy the property and also demanded return of their deposit. In this circumstance, CDC was under no continuing obligation to tender title again, with the corrected certificate, because the Lakers had yet again announced that they would not buy the property. A' party is not required to tender performance when to do so would be a useless act. Taylor v. Roy, 499 So.2d 595 (La.App. 5th Cir.1986). Indeed, it is not at all clear that CDC was required .to tender title on June 20, when the Lakers had informed Harry Crosby two days before that they were not going to buy the house. However, since tender was made, that issue is not before us.
As a final matter, CDC urges that it was entitled to an award of further damages which it proved at trial. This assertion arises from a misunderstanding of the contract at issue. That document provided only two alternatives in the event of a breach: recovery of stipulated damages or specific performance. CDC sought the first remedy and prevailed. It is therefore entitled to no other damages, Rabin v. Blazas, 537 So.2d 221 (La.App. 4th Cir.1988).
For the foregoing reasons, the judgment of the district court is hereby affirmed.
AFFIRMED.